423 P.2d 155

**Carroll FREEMAN et al., Plaintiffs and Appellants,**

**v.**

**Leland O. GEE, Vilate D. Gee, James F. Craner and Ida Craner, Defendants and Respondents.**

No. 10590.

Supreme Court of Utah.

Jan. 26, 1967.

VanCott, Bagley, Cornwall & McCarthy, Leonard J. Lewis and C. Keith Rooker, Salt Lake City, for appellants.

Alan H. Bishop, Richard L. Bird, Jr., Salt Lake City, for respondents.

CROFT, District Judge:

This action was commenced by appellants to enjoin the further use by respondents of their respective residences as two-family dwellings, which, it is alleged, were built and used as such by respondents in violation of restrictive covenants of record relating to the established subdivision in which they live. From a judgment dismissing their complaint as stating no cause of action, plaintiffs appealed.

The appellants, 21 in number, are the individual owners of residential lots in Indian Rock Subdivision, a first-class residential area located in the vicinity of Wasatch Drive at about 20th South in Salt Lake City, Utah. The Craners are the owners of a two-family dwelling located on Lot 16 of the subdivision and the Gees are the owners of a two-family dwelling located upon portions of Lots 9 and 10 of the subdivision.

Indian Rock Subdivision, consisting of Lots 1 through 41, was established in April 1952, by its then owners. A set of restrictive covenants relating thereto was recorded on April 26, 1952, in the office of the Salt Lake County Recorder and provided that all and each of the lots in the subdivision "shall be subject to and shall be conveyed subject to the Reservations, Restrictions and Covenants" thereinafter set forth, the material portions of which read as follows:

### Covenant I

Each and every lot above described shall be known and is hereby designated as a "Residential Lot" and no structure shall be erected, altered, placed or permitted to remain on any such "Residential Lot" other than one detached single family dwelling not to exceed two stories in height and a private garage for not more than three automobiles, except that one detached single family

dwelling or a duplex may be erected on each of Lots Nos. 30, 31, 38, 39, and 41.

### Covenant III

No building shall be erected, placed or altered on any building plot in this subdivision until the building plans, specifications, and plot plan showing the location of such building have been approved in writing as to conformity and harmony of external design with existing structures in the subdivision, and as to location of the building with respect to topography and finished ground elevation, by a committee composed of Richard R. Hoyt, John Glauser and J. Alvon Glauser, or by a representative designated by a majority of the members of said committee. In the event of death or resignation of any member of said committee, the remaining member or members shall have full authority to approve or disapprove such design and location or to designate a representative with like authority. In the event said committee, or its designated representative, fails to approve or disapprove such design and location within 30 days, after said plans and specifications have been submitted to it or, in any event, if no suit to enjoin the erection of such building or the making of such alterations has been commenced prior to the completion thereof, such approval will not be required and this Covenant will be deemed to have been fully complied

with. Neither the members of such committee, nor its designated representative shall be entitled to any compensation for services performed pursuant to this Covenant. The powers and duties of such committee, and its designated representative, shall cease on and after May 1st, 1957, thereafter, the approval described in this covenant shall not be required unless prior to said date and effective thereon, a written instrument shall be executed by the then record owners of a majority of the lots in this subdivision and duly recorded appointing a representative, or representatives, who shall thereafter exercise the same powers previously exercised by said committee.

### Covenant V

No noxious or offensive trade or activity shall be carried on upon any residential lot hereinbefore described or any part or portion thereof, nor shall anything be done thereon which may become an annoyance or nuisance to the occupants of the remaining residential lots hereinbefore described.

### Covenant VI

No trailer, basement, tent, shack, garage, or other outbuilding erected in, upon or about any of said residential lots hereinbefore described or any part thereof shall at any time be used as a residence temporarily or permanently, nor shall any structure of a temporary character be used as a residence.

### Covenant VIII

No signs, billboards or advertising structures may be erected or displayed on any of the residential lots hereinbefore described or parts or portions of said residential lots except that a single sign, not more than 3 x 5 feet in size, advertising a specific lot for sale or house for rent, may be displayed on the premises affected.

### Covenant IX

No trash, ashes or any other refuse may be thrown or dumped on any residential lots hereinbefore described or any part or portion thereof.

From the record before us the following facts are apparent:

The Craners obtained a warranty deed to Lot 16 on August 30, 1955, which deed recited that Lot 16 was "subject to the building restrictions of record affecting Indian Rock Subdivision." A house was built on the lot in 1955 consisting of two levels, each level being furnished at the outset with complete facilities for living purposes. Upon completion, the Craners occupied the lower level and have done so continuously up to the present time. The upper level was occupied upon completion by the Craners' son and his family who resided there until February, 1964, when they moved. Thereafter the Cran-

ers rented the upper level to non-relative tenants at a monthly rental of $100. Since 1955, the only remodeling that was done was the installation in October, 1964, of a front door for the lower level. In a deposition included in the record Craner stated he knew some building restrictions relating to one-family dwellings existed on Lot 16 but he "paid no attention to it."

The Gees obtained their building lot by warranty deed dated October 11, 1961, from Earl R. Belnap, who thereafter built a home on the property for the Gees. This deed made no mention of the restrictive covenants, although the deed by which Belnap obtained title to the property in April, 1960, recited that the land was subject to the restrictive covenants here involved. Belnap, a builder of thirty years' experience, had built a prior home for the Gees and had discussed the restrictive covenants with the Gees before building the house. Nevertheless, at the request of the Gees, Belnap drew up plans for, and built, a duplex for the Gees. The house was constructed with complete housing units on both floors, each having two separate outside entrances. The Gees moved into the upper unit in April, 1962, and their son and his family occupied the lower floor from March 15, 1962, until August, 1965, when the son moved, following which the Gees rented to another tenant.

Prior to the construction of the Gee house, one Louis S. DeEnis wrote a letter dated November 13, 1961, to Gee, advising him that residents of the subdivision had met about an apparent violation of the restrictive covenants due to the intended construction of a building other than a single-family dwelling on Gee's lot and requesting Gee to contact DeEnis. In response, Gee signed a letter dated November 20, 1961, addressed to DeEnis, in which it was stated that the house was being built according to plans and specifications approved by him and that he intended to occupy the house with his family and did not intend to use the property "for income property."

Appellants filed their complaint on August 12, 1965, followed by an amended complaint on October 13, 1965, by which pleadings they allege that the Gees and Craners each built and used their respective homes as two-family dwellings and that such use is in violation of the restrictive covenants of record pertaining to the subdivision in question restricting the homes to be built on the lots in question to single-family dwellings. Appellants sought injunctive relief against both Gees and Craners to enjoin the use and maintenance of their respective homes as two-family dwellings, or, in the alternative, damages for such violations.

In their answer the Craners admitted the house was designed and built for two-family occupancy. In their answer the Gees admitted they constructed a two-family dwelling and affirmatively allege the

residence was and had always been a "duplex," occupied by two separate families. In identical answers to the amended complaint, each defendant sets up multiple defenses, included among which are failure to state a claim, failure to start action within 30 days after erection of the buildings, invalid restrictive covenants, laches, waiver, estoppel, abandonment, and in effect, a general denial. Each also has alleged the building committee provided for by Covenant III had never functioned.

After extended proceedings, the court below entered its first pretrial order on October 29, 1965, setting forth as one issue, among others, as to whether there is "a distinction between construction covenants and use covenants as it applies to this case." All parties filed motions to amend this pre-trial order, appellants moving that the foregoing issue be stricken and that the court make an express ruling as a matter of law that Covenant I is a "use" covenant as well as a "construction or building" covenant. After hearing, the court, on December 17, 1965, entered an amended pre-trial order containing various issues, but taking appellants' motion for the requested ruling under advisement.

Thereafter, the court by memorandum decision of December 20, 1965, ruled that Covenant I, except as to the words, "permitted to remain," was a "building covenant only," stating it did so "believing that the law as set out in Parrish v. Richards, 8 Utah 2d 419, 336 P.2d 122, requires definite and clear terms in covenants restricting the use of real property."

Pursuant to its memorandum decision, the court entered an order on March 9, 1966, dismissing appellants' complaint as stating no cause of action, ruling (1) that covenants restricting the use of real property in Utah must be strictly construed; (2) that Covenant I, when interpreted in conjunction with other covenants included in the restrictions, pertains to "matters of construction and physical qualities only," and that the words "permitted to remain" as used therein relate to issues of changing original construction and physical qualities only; and (3) that the only paragraphs of restriction relating to "use" of buildings once constructed are Covenants V, VI, VIII and IX.

It is the validity of this order that we are called upon to review.

As noted, the trial court made its decision based upon the belief that the law as set out in Parrish v. Richards, 8 Utah 2d 419, 336 P.2d 122, required definite and clear terms in covenants restricting the use of real property. In that case this Court had before it the question as to whether or not the building of a tennis court on a residential lot was a violation of a restrictive covenant which provided that no structure should be erected other than a garage and one single-family dwelling. This Court, applying the ejusdem generis rule, conclud-

ed that the word "structure" related only to buildings and not to a tennis court and its surrounding fence. The Court recognized as a correct doctrine the rule that in the construction of uncertain or ambiguous restrictions, the courts will resolve all doubts in favor of the free and unrestricted use of property. We do not quarrel with this principle of law, but only with the conclusion reached by the trial court in its application of it to the restrictions in the case at bar.

In Reese Howell Co. v. Brown, 48 Utah 142, 158 P. 684, this Court, in response to the contention of appellant therein that uncertainty or ambiguity in a grant must be construed most strongly against the grantor, said:

> We have, however, held, and are firmly committed to the doctrine, that we will have recourse to every aid, rule, or canon of construction to ascertain the intention of the parties before having recourse to the rule of construing the language of the parties either most strongly against or in favor of either of them. * * * Under such circumstances it should be the aim of courts, as, no doubt, it is their duty, to ascertain and declare the intention of the parties, since that, and nothing else, constitutes their contract; and it is the duty of the courts to enforce, not to make, contracts. If, therefore, we can ascertain or determine the intention of the parties to the deed in

question by having recourse to the ordinary rules of interpretation and construction, we may not invoke the rule insisted on by appellant's counsel.

The Indian Rock Subdivision, located in the foothills of the Wasatch Mountains, is an ideally located, first-class residential area. The intention of the original developers of the subdivision as manifested in the restrictive covenants is not fraught with uncertainty or ambiguity. Duplexes are expressly permitted upon only five specified lots (not those here involved) of the 41 lots in the subdivision. On all others only "one detached single family dwelling" is to be "erected, altered, placed or permitted to remain" thereon. We conclude that this terminology restricts the occupancy of such dwellings to one family only and that the prohibition against duplexes on the lots in question is applicable regardless of whether the division in two-family occupancy is horizontal or vertical. The provisions of the restriction that no structure shall be "altered" or "permitted to remain" on such lots other than as detached single-family dwellings negates future use of the structure for any other purpose. The prohibition against alteration of a structure for any other purpose reasonably relates to alteration of a structure after completion and not merely to a change in plans before or during the construction period. Covenant X of the restrictions provides that all covenants and restrictions

therein stated shall run with the land and shall be binding on all parties claiming any interest in the lots until 25 years from April 25, 1952, and longer by ten-year intervals unless a majority of the owners otherwise agree after the 25-year period. Covenant XI provides that if any party having an interest in any lot shall violate or attempt to violate any of the covenants and restrictions *prior to 25 years* from the date thereof, any other person owning any other lot can prosecute an action to either prevent such violation or recover damages for it. Thus the intent that the subdivision should be maintained for "single family" occupancy for at least 25 years seems clear and unambiguous. If the parties had intended that, once erected, the flood gates could be opened and any structure could thereafter be converted to multiple-family use, they could have clearly said so and would not have restricted the construction of duplexes to only five specific lots. But having so restricted, the intent to limit the remaining 36 lots to single-family use and occupancy is manifestly apparent.

Upon oral argument and in their brief respondents concede that, standing alone, Covenant I could well be interpreted as limiting "use" as well as limiting the type of construction permitted, but argue that where, as here, other restrictions expressly prohibit certain uses, such is not the case. So, say respondents, since Covenants V, VI, VIII and IX relate generally to "use," then use of the completed structures must be "measured by" these four covenants, none of which, it is argued, restrict use to single-family occupancy. Respondents in their brief also suggest that had the preparer of the covenants desired to prohibit use of the structures as duplexes, Covenant VI should have been expanded to restrict such use. Perhaps the reason they did not do so is because Covenant I had already done so.

The so-called use covenants should be examined in the light of the intended use of each lot, namely, residential purposes. Covenant V provides that no noxious or offensive trade or activity shall be carried on upon any lot nor shall anything be done thereon which may become an annoyance or nuisance to other occupants; Covenant VI prohibits the use of trailers, basements, tents, shacks, garages or other outbuilding from being used as a residence; Covenant VIII prohibits the erection or display of signs, billboards or advertising structures upon the lots; Covenant IX prohibits the throwing or dumping of trash, ashes or other refuse on the lots. If these four covenants alone are a measure of the prohibited uses of each lot, then one can only say that any use of a "detached single family dwelling" erected thereon which does not fall within the ambit of being a "noxious or offensive trade or activity," or which does not become "an annoyance or nuisance" to other occupants, or which does

not consist of posting signs or dumping rubbish, is permissible, regardless of what it may be. If Covenant I is not a "use" restriction, how can the "single family dwellings," or the duplexes where permitted, be restricted to residential use if prohibited uses are to be found only in Covenants V, VI, VIII and IX? Do not these restrictions more properly restrict conduct rather than go to the nature of the occupancy and the type of use permitted?

20 Am.Jur.2d, Covenants, Conditions & Restrictions, Section 190, cited by respondents in their brief, states:

> Similarly, a covenant against the erection of a building other than a one-family or single dwelling house has been held to restrict the use of the building when erected to one-family purposes.

However, in support of their argument that the four mentioned covenants alone are a measure of restricted use, respondents cite certain cases as holding that restrictions against the erection of a building other than a° dwelling house restrict only the type of construction, not subsequent use, particularly where another restriction expressly prohibits certain uses. We consider now these cases, bearing in mind that with respect to restrictive covenants of this nature, the cases appear in irreconcilable conflict (14 A.L.R.2d 1380).

In Neptune Park Assn. v. Steinberg, 138 Conn. 357, 84 A.2d 687, the covenant provided that no building "other than a dwelling house" should be erected. Another restriction was that no public hotel, public bath house or club house, shop, store, saloon or other place of business could be erected. The court refused to enjoin the use of a 14-room house as a summer home by four sisters and their families, noting that the house was occupied as one unit with no structural changes and all using the same facilities. The court said use of the term "a dwelling house" found sharp conflict in the authorities on whether this meant a single family, concluded it was directed at form and design and not to use by a single family, and did so for the stated reason "If it had been intended to control the use of the structure, it could easily have so stated." We think Covenant I does so state.

Daniels Gardens, Inc. v. Hilyard, 29 Del. Ch. 336, 49 A.2d 721, was a case in which plaintiffs sought to enjoin use of part of a living room as a delicatessen store by one defendant and the use of half a basement by another defendant as a pickup station for the collection and distribution of clothes to be cleaned and pressed off the premises. The two restrictive covenants considered by the court were about identical with Covenants I and V herein being considered. The court refused to enjoin such use, holding that Covenant I did not relate to use, so holding on the ground that unless the complainant could advance reasons to show why no substantial part of the covenant

prohibiting any noxious or offensive trade or activity would be rendered meaningless by a construction of the other covenant which would make it applicable to the use of the structure, then the former restriction could be used as a reason for construing the latter covenant as inapplicable to use generally. The fact that a substantial part of Covenant I would be rendered meaningless by such reasoning seems to have been ignored by the Delaware Court completely.

In Jones v. Park Lane for Convalescents, 384 Pa. 268, 120 A.2d 535, the restriction was that the lot shall be used only for the purpose of erecting thereon "private dwellings." The court stated that this restriction "contains no statement or provision whatever as to the subsequent occupancy of the structures or the uses to which they might be devoted." A strong dissent rejected the majority decision as ridiculous, since such a ruling permitted a change in use one day after completion, and said:

> Whenever two interpretations of a written instrument are reasonably possible, and one construction produces a reasonable result which is in accord with the likely or clearly possible object, purpose and intent of the parties, and the other construction produces a result which is unreasonable or absurd, the latter construction should never be adopted.

In Jordan v. Orr, 209 Ga. 161, 71 S.E.2d 206, the defendants converted their house to two units, living in one and renting out the other. The restriction was that the property "shall be used only for residential purposes with the understanding that no duplex or apartment house is to be erected thereon, and shall not be used for cemetery, hospital, sanitarium, or any business purposes". The court ruled that the change to two units was not to a duplex; that the first part of the covenant applied to building restrictions (notwithstanding the phrase "shall be used only"); and that only the negative part of the covenant related to use.

Contrary to the decisions in these cases, numerous courts, construing various word combinations, have held that restrictive covenants containing similar provisions, including in some cases another restriction expressly prohibiting certain uses, limit subsequent use as well as controlling the type of structures to be built. In 26 C.J.S. Deeds § 164(3) c, at page 1122, it is stated:

> It has been held, however, that a restriction prohibiting the erection of anything except "a residence," or "a single residence," or "one residence only" or a similar restriction, is violated by the erection of * * * a duplex, or any building except a single family residence; that such restriction as to erection of the prohibited building also bars the occupancy thereof by more than one family * * *

In Upper Arlington Co. v. Lawwell, 20 Ohio App. 362, 152 N.E. 203, wherein the restrictive covenants said the premises shall be used "for residence purposes only" and not for any purpose of trade or business, and further provided that no building except one single, private dwelling with necessary outbuildings shall be erected or maintained, the court rejected the contention of defendant therein that the covenant related only to original construction and not to remodeling and held the remodeling (conversion of a window to a door) violated the covenant and ordered the premises restored to their former condition.

In Nerrerter v. Little, 258 Mich. 462, 243 N.W. 25, the restrictive covenants provided that nothing but a dwelling house or a duplex dwelling could be built on lots. The court in enjoining the use of a house for boarding and rooming children of separated parents, notwithstanding the commendable purpose to which the structure was being put, said:

A restriction limiting the construction of a building on premises to a dwelling house means a building designed as a single dwelling to be used by one family. * * * The property itself is in a high-class neighborhood, wholly residential in character. The restriction goes to the use of the building as well as to the character of the building.

In Holderness v. Central States Finance Corp., 241 Mich. 604, 217 N.W. 764, the court said a provision restricting property "for dwelling house purposes only" must be held "to be a restriction controlling the use, as well as the character of the building to be erected"; adding, significantly, that "[a]ny other construction deprives the provision of all beneficial force and would be a mere evasion."

In Schadt v. Brill, 173 Mich. 647, 139 N.W. 878, 45 L.R.A.,N.S., 726, the court enjoined construction of a two-family dwelling under restrictions limiting buildings to "a dwelling house," and while not passing on the specific issue here involved, made the significant observation that "The structure defendants propose to erect, standing alone, might not be in a sense unworthy of the neighborhood, but that is not the test in construing this restriction. If one can build a double house in that subdivision, all may do so."

In Hooker v. Alexander, 129 Conn. 433, 29 A.2d 308, the covenant restricted buildings to be erected or maintained, to "one-family dwelling house" on each lot. The defendant converted a structure to a rooming house and had eight roomers. The court said a "one family house" is a house occupied by one family, and rejected defendant's claim that the word "maintain" used in the covenant related to its structure rather than its use, noting that "[I]f this were true, there would be nothing to prevent the use of a one-family house for the

most objectionable purposes as long as the exterior was kept in the same condition."

To the same effect is Simons v. Work of God Corp., 36 Ill.App.2d 199, 183 N.E.2d 729, wherein the court rejected the contention that the restriction there under consideration was merely a building restriction and not a use restriction.

In Meyer v. Stein, 284 Ky. 497, 145 S.W. 2d 105, the covenant provided that lots shall be used "only for the erection of a single residence." That court also rejected the contention made that such a covenant related only to the building of the homes and placed no limitation upon their use after they were once constructed in conformity with the restrictions, saying that if such argument were accepted, " * * * then building restrictions would render the owners of property no benefit and parties incorporating such restrictive covenants in their deeds would be doing a vain thing."

In Powers v. Radding, 225 Mass. 110, 113 N.E. 782, the restrictive covenant provided that but "one dwelling house shall be erected thereon." The court said these words "should define the use to which that dwelling should be put and not merely the form of the structure."

In Zelinski v. Becker, 318 Mich. 209, 27 N.W.2d 615, the court said:

Covenants restricting the erection of any building except for dwelling house purposes are construed to apply to use as

well as to the character of the building and in strictly residential neighborhoods where compliance therewith has always been had, nullification of the restrictions is deemed a great injustice to the owners of the property.

In Hogue v. Dreeszen, 161 Neb. 268, 73 N.W.2d 159, wherein the covenants provided not only that not more than one dwelling house shall be erected on any one lot, but also expressly provided that no store, public stable, wood yard, manufacturing establishment, laundry, factory, warehouse or shop shall be erected on said lots, the court said:

* * * we think that the restrictions were intended to and had the purpose and effect of limiting the use of the lots to dwelling houses * * * The affirmative provisions as to what can be built are clear; the negative provisions simply reinforce the permissive use construction.

These citations reflect substantial authority that covenants such as here involved, restricting construction on residential lots to dwelling houses, relate to use as well as construction. One might well argue that with the many and varied covenants that have been construed and the irreconcilable conflict in the cases with respect thereto, that, absent an identical set of restrictive covenants, all cases are distinguishable. Be that as it may, whatever language is employed in stating a restric-

tion, such language is to be taken in its ordinary and generally understood and popular sense, and is not to be subjected to technical refinement nor the words torn from their association and their separate meanings sought in a lexicon. Terms as a connected whole are employed for a purpose, and if such purpose is manifest, and the words to accomplish it apt, one need only make application thereof to whatever facts may be established by evidence upon the trial of a case. (Seeley v. Phi Sigma Delta House Corp., 245 Mich. 252, 222 N.W. 180).

We therefore hold in the case at bar that the stated provisions in Covenant I, namely, that "no structure shall be erected, altered, placed or permitted to remain on any such 'Residential Lot' other than one detached single family dwelling," relate to use after construction as well as to what may be initially erected. This is particularly so where, as here, the covenant expressly provides that a duplex may be erected, in lieu of a single-family dwelling, on only five of the 41 lots in the subdivision. And "one detached single family dwelling" we construe to mean a dwelling to be used by one family. Accordingly, the order of the trial court dismissing the complaint is reversed and the case is remanded to the district court for trial upon the remaining issues set forth in the pre-trial order.

In so ruling, we have not overlooked the provisions of Covenant III relating to the submission of building plans, specifications and plot plan to a committee for approval "as to conformity and harmony of external design with existing structures in the subdivision, and as to location of the building with respect to topography and finished ground elevation." Failure of this committee to function does not mean that all other restrictive covenants are waived. It means only that the failure to act in any of the ways set forth in Covenant III constitutes a waiver of the requirement of committee approval as above set forth, in which event Covenant III "will be deemed to have been fully complied with." This covenant surely contemplates that any plans and specifications submitted for approval would be drafted in conformity with the requirements of the other restrictive covenants.

One other matter raised on appeal remains to be considered. Between the filing of the memorandum decision in December, 1965, and the entry of the order of dismissal of March 9, 1966, appellants changed attorneys for reasons not disclosed by the record. Appellants' new counsel filed a motion for reconsideration of the court's memorandum decision, and at the hearing on this motion on March 4, 1966, counsel for appellants asked to be relieved from the binding effects of a statement made by former counsel relative to the nature of the relief being sought, whereby said former counsel had orally advised the

**352**

court they were not seeking demolition of the homes or any change in the outward physical aspects of the structures, but were only seeking to restrict the use of the residences to conform to the use permitted or allowed under the restrictive covenants. Such relief was denied by the court below and appellants assert that such ruling was a "manifest abuse of discretion that alone warrants the reversal of the decision of the trial court."

We see no such manifest abuse of discretion nor does it appear from the record before us that any demolition of either structure would be justified should appellants prevail at the trial. However, we conclude that appellants should be entitled to seek upon trial whatever remedy is or may be necessary to reasonably and effectively carry out the restrictions created by the covenants should the trial court determine that appellants are entitled to the benefits thereof.

Reversed.

TUCKETT and HENRIOD, JJ., concur.

CALLISTER, J., having disqualified himself, did not participate herein.

McDONOUGH, J., heard the arguments but died before the opinion was filed.

CROCKETT, Chief Justice: (dissenting in part).

I agree with what I assume is the effect of the main opinion: remanding the case for trial of the issues other than the one resolved therein. But I find myself in disagreement with statements therein indicating that it should be ruled as a matter of law that Covenant No. I is a covenant restricting the *use* of the defendants' property. From my consideration and analysis of the covenants, I am left in doubt as to the correct conclusion as to what the parties should be deemed to have intended. I therefore believe that this issue should also be included on the trial and that the parties should be permitted to present whatever competent evidence they desire pertaining to it. That there is a basis for being uncertain about the meaning and proper application of the covenants could hardly be better pointed up than by the fact that the trial judge, presumably a reasonable man, has come to one conclusion, whereas, Judge Croft and my colleagues who concur with him, with respect to whom the same presumption obtains, have come to the opposite conclusion.

I offer certain further observations in support of my opinion that the issue should be resolved by trial.

A proper analysis of the problem here presented should proceed from the foundational proposition that the owner has a right to the free and uninhibited use of his property, except only as it may be expressly limited by law or by contract. We are

here concerned with the latter. As is recognized in the main opinion, referring to Parrish v. Richards, any such restriction must be set forth in clear and definite terms; and in case of uncertainty or ambiguity, doubts should be resolved in favor of freedom of use of property.[1] It is the responsibility of a party seeking to enforce such a covenant to prove the existence of a valid covenant and of the conditions prerequisite to its enforcement.

The next proposition of importance here is that both of the defendants' houses were constructed as duplexes; that they have been so used for several years; and that they cannot now be charged as violative of the *construction* covenant. Covenant No. III which deals with the submission of a building plan for approval has admittedly never been complied with by the plaintiffs in any respect, and it provides that "In any event, if no suit to enjoin the erection of such building * * * has been commenced prior to the completion thereof, such approval will not be required and this covenant will be deemed to have been fully complied with." There is therefore no possibility that the defendants could be held in violation of Covenant No. III. Nor is it even so contended. It is also true that in the other covenants, which relate to the use of the property, there is no restriction against the use of a residence as a duplex.

We then must turn to Covenant No. I, which is the fulcrum upon which Judge Croft bases his deduction that there is a covenant against use of the premises as a duplex. It will be noted that that covenant does not contain either the word "use" or any synonym or substitute for it. The only phrase that could be interpreted as pertaining to restriction of use would be the words "permitted to remain." But these words are the concluding words of a series: " * * * no structure shall be erected, altered, placed or permitted to remain on any such residential lot."

The defendants' point of view is that the commonly accepted rule of construction should be applied, under which, the phrase "permitted to remain" would take character and meaning from the preceding words "erected, altered, [or] placed" and thus would be understood as referring to construction.[2] On the other hand, the plaintiffs contend that even though the phrase in question does not say so in precise words, its reasonable interpretation would be that it restricts the "use" of the property. Although the interpretation of documents is usually for the court, in view of this uncertainty, it would be permissible to take evidence as to the background, surrounding circumstances, and the interpretation the parties have placed upon

1. 8 Utah 2d 419, 336 P.2d 122.
2. See statement re rule of noscitur a sociis in Hatch Co. v. Public Service Commission, 3 Utah 2d 7, 277 P.2d 809; 66 C.J.S. p. 607.

the covenant, to determine its meaning.[3] Having a bearing on this would be the facts that the defendants constructed their homes as duplexes without objection and have so resided in them for several years.

For the foregoing reasons it is my opinion that the remand for a trial upon the other issues should also include trial of the issue as to what the parties should be deemed to have understood by the covenants in question.

---

3. See Charlton v. Hackett, 11 Utah 2d 389, 360 P.2d 176.